IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and CHARLES A. WHOBREY, as Trustee, | ) ) ) ) | |
| Plaintiffs, | ) ) | No.   20 C 4610 |
| v. | ) ) | |
| TRANSERVICE LOGISTICS, INC., | ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and CHARLES A. WHOBREY, as Trustee, | ) ) ) ) | |
| Plaintiffs, | ) ) | No.   20 C 4611 |
| v. | ) ) | Judge Ronald A. Guzmán |
| ZENITH LOGISTICS, INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons explained below, defendants' motions to dismiss the complaints pursuant to Federal Rule of Civil Procedure 12(b)(6) are granted.

### BACKGROUND

Plaintiffs, Central States, Southeast and Southwest Areas Pension Fund and its Trustee, Charles A. Whobrey (collectively, the "Fund"), brought these ERISA actions seeking to recover from defendants Transervice Logistics Inc. ("Transervice") and Zenith Logistics, Inc. ("Zenith") a year's worth of contributions, interest, and liquidated damages for work performed by covered employees between February 2019 and February 2020.

Defendants move to dismiss the Fund's complaints under Federal Rule of Civil Procedure 12(b)(6).

**DISCUSSION**

For purposes of a motion to dismiss under Rule 12(b)(6), the Court construes the complaint in the light most favorable to the plaintiffs, accepts as true all well-pleaded facts therein, and draws all reasonable inferences in plaintiffs' favor. *See Bultasa Buddhist Temple of Chi. v. Nielsen*, 878 F.3d 570, 573 (7th Cir. 2017); *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). On a motion to dismiss, the Court may consider the allegations of the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

Under ERISA, 29 U.S.C. § 1145, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." On January 31, 2013, Zenith entered into a collective bargaining agreement (the "Zenith 2013 CBA") with Local Union No. 89 of the International Brotherhood of Trustees (the "Union" or "Local 89"). (Case No. 20 C 4611, ECF No. 1, Zenith Compl. ¶ 9.) On February 8, 2013, Transervice entered into a collective bargaining agreement (the "Transervice 2013 CBA") with Local 89. (Case No. 20 C 4610, ECF No. 1, Transervice Compl. ¶ 9.) Both 2013 CBAs provided that certain full-time and part-time (referred to in the Zenith CBA as "casual") employees would be covered by the Fund. Transervice agreed in its CBA to pay to the Fund the costs to maintain current pension benefits "for the life of the CBA with no cost to the employee." (*Id.* ¶ 11.) Zenith agreed in its CBA to pay certain weekly contribution amounts for covered employees at Zenith's Louisville location. (Zenith Compl. ¶ 11.) Defendants also agreed to be bound by the terms of the Fund's Trust Agreement and all of the rules and regulations adopted under it. Both 2013 CBAs contained the following provision, which included an "evergreen" clause:

> This Agreement shall be effective as of February 1, 2013 and shall expire January 31, 2019; provided, however, that if neither party gives the other party written notice sixty (60) days prior to the said expiration date of such parties [sic] intention to terminate this Agreement, said Agreement shall continue for another year and from year to year thereafter, subject to sixty (60) days' notice of termination prior to any succeeding termination date.

(Zenith Compl., Ex. 1, Zenith 2013 CBA, at 33; Transervice Compl., Ex. 1, Transervice 2013 CBA, at 38.) Unlike some CBAs that allow mid-term renegotiation or modification at a party's request, the 2013 CBAs did not contain such a "reopener" provision.

In February 2019, the Fund received a letter from Transervice that attached a copy of a new CBA that Transervice had entered into with Local 89. In the letter, Transervice stated that, effective January 31, 2019, its obligation to contribute to the Fund would cease and that Transervice would withdraw from the Fund with respect to employees who were members of Local 89. The Fund received a similar letter from Zenith in February 2019. The 2019 CBAs provide that defendants' obligations to contribute to the Fund ceased on January 31, 2019, and that effective February 1, 2019, the covered employees would participate in a different pension plan, the IBT Consolidated Pension Plan. The week ending on February 2, 2019 was the last week for which Transervice and Zenith paid contributions to the plaintiff Fund on behalf of employees covered by the 2013 CBAs.

It is the Fund's position, however, that neither Transervice or Zenith nor Local 89 sent a timely written notice to the other party of an intent to terminate the 2013 CBA. Because there was no such notice, says the Fund, the 2013 CBAs continued for another year under their respective "evergreen" clauses, and defendants were obligated to contribute to the Fund for that additional year pursuant to the Fund's Trust Agreement.[1]

Defendants contend that the complaints must be dismissed because Local 89 did send written notices to Transervice and Zenith more than sixty days before the 2013 CBAs expired, which they say made clear the Union's "intention to terminate" those CBAs. The letters were dated November 6, 2018 and bore the boldface header "CONTRACT EXPIRATION: 1/31/2019" for Transervice and "CONTRACT EXPIRATION: 2/01/2019" for Zenith. The body of the letters is identical and states as follows:

> Your present contract with General Drivers, Warehousemen, and Helpers, Local Union No. 89, expires as noted above.
>
> It is our desire to meet with you at an early date for the purpose of negotiating a new contract.
>
> We trust the forthcoming negotiations will result in an agreement that will be fair and just too [sic] all parties involved and that a better spirit of harmony and cooperation will be derived there from [sic].

(Case Nos. 20 C 4610 & 4611, ECF Nos. 1-2.) Enclosed with the letters was a copy of a "Form F-7" notice that the Union had submitted to the Federal Mediation and Conciliation Service ("FMCS"), an independent federal agency that must be notified if a party to a CBA notifies the other party of an intent to terminate or modify the agreement. The Form F-7 provides three checkboxes for "Notice Type"—"Initial Contract," "Reopener," and "Renegotiation." The

---

[1] The Fund's Trust Agreement states in relevant part: "An Employer is obliged to contribute to the Fund for the entire term of any collective bargaining agreement or participation agreement or any other written agreement accepted by the Fund (including any extension of a collective bargaining agreement through an evergreen clause or through an extension agreement of eighteen months or less) on the terms stated in that collective bargaining agreement . . . ." (Case No. 20 C 4610, ECF No. 1-4, Trust Agreement, at 12.)

3

Union had checked "Renegotiation" on each form and had provided the 2019 "contract expiration date" for each contract. (Case No. 20 C 4610, ECF No. 17; Case No. 20 C 4611, ECF No. 1-2.)

Defendants point out that the employees at issue were covered between February 2019 and February 2020 because the 2019 CBAs, copies of which are attached to the complaints, require defendants to make contributions to an entirely different pension fund, the IBT Consolidated Pension Plan. Defendants argue that there is no plausible construction of the Union's November 2018 notice and Form F-7 other than stating an intent to terminate the 2013 CBAs, and that the Fund is therefore pursuing windfall contributions. Defendants emphasize that the Fund's theory is not that the *Fund* failed to receive the notice that it required, but that neither party to either of the 2013 CBAs (each employer and the Union) provided sufficient notice of termination of the 2013 CBAs *to the other party*, even though after the Union sent its letters the parties proceeded to negotiate and execute new CBAs.

The Court must "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *M & G Polymers USA, LLC v. Tackett,* 574 U.S. 427, 435 (2015). Where the words of a written contract are clear and unambiguous, the meaning of the contract is ascertained in accord with its plainly-expressed intent. *Id.* The question is whether Local 89 provided an "unambiguous, timely notice" of its intent to terminate the 2013 CBAs—in other words, what this party to these particular CBAs set out to achieve with its chosen language. *See Rutherford v. Judge & Dolph Ltd.*, 707 F.3d 710, 712 (7th Cir. 2013); *Off. & Prof'l Emps. Int'l Union, Local 95 v. Wood Cnty. Tel. Co.*, 408 F.3d 314, 316 (7th Cir. 2005). The parties agree that in order to demonstrate an intent to terminate an agreement, a communication need not explicitly use the word "terminate" or "termination."

In the subject line of its letter, the Union referred to the impending "expiration" of the contract, and it stated again in the body of the letter that the contract would "expire" on the stated date. The Union said that it desired to meet to negotiate "a *new* contract." (ECF No. 1-2 (emphasis added).) It did not refer to reopening, modifying, or renegotiating the current contract in any way and did not imply any desire to change or continue the current contract past its expiration date. The letter therefore constituted an unequivocal expression of the intent to terminate the current contract; as defendants point out, how could there be a "new" contract without a termination of the old one? This conclusion is buttressed by the Union's enclosure of the Form F-7, on which the Union did not check the "reopener" box, but chose "renegotiation," the only alternative for a contract that was not an initial contract. Under 29 U.S.C. § 158(d)(3), a party desiring "termination or modification" of a CBA is required to notify the FMCS of a potential labor dispute, and the form serves as that notice. The terms of the 2013 CBAs did not provide for modification; termination was the only alternative. And, indeed, the effect of the letter was that the parties went on to negotiate and enter into new CBAs within the sixty-day notice period. While the Union did not use the word "terminate," the only reasonable reading of its letter is that it was conveying an intent to terminate the 2013 CBAs. Notably, the Fund does not provide any alternative construction of the letter that takes into account its entire text.

The Fund asserts that the Union's statement that it believed negotiations would bring a "better spirit of harmony and cooperation" indicates that its expectation was that "the relationship [with defendants] was continuing, not ending." (ECF No. 26, Pls.' Mem. Resp. at 6.) The Court agrees, but the Fund does not accurately frame the salient issue, which is under what governing document the contracting parties' relationship would continue. The Union clearly contemplated, and expressed, that the negotiations it desired would result in "a new contract," because the current one was "expiring." Given the terms of the 2013 CBAs, which did not provide for modification or reopening, the Union was stating its intent to terminate.

The Fund also cites *Wood County* for the proposition that "a mere reference to negotiations for a replacement agreement will not forestall an evergreen clause," (*id.* at 6-7), but *Wood County* is distinguishable. There, the union notified the employer of its "desire to reopen th[e] Agreement and to negotiate on wages, hours and conditions of employment for a successor agreement." 408 F.3d at 315. Local 89's letter, however, makes no reference to any desire to "reopen" or to otherwise modify the existing CBA. Other decisions cited by the Fund in support of its position are similarly distinguishable.

Local 89 provided defendants with unequivocal, timely notice of its intent to terminate the 2013 CBAs. Therefore, the Fund's complaints will be dismissed. Because there appears to be no possibility of successful amendment, the dismissals will be with prejudice.

## CONCLUSION

Defendant Transervice Logistics Inc.'s motion to dismiss the complaint in 20 CV 4610 [18] is granted. Defendant Zenith Logistics, Inc.'s motion to dismiss the complaint in 20 CV 4611 [17] is granted. These actions are dismissed with prejudice. Civil cases terminated.

**DATE:** November 17, 2020

*[signature: Ronald A. Guzmán]*

**Hon. Ronald A. Guzmán**
**United States District Judge**